## EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT DAVID X. O'NEILL

I, Special Agent David X. O'Neill, being duly sworn, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately twenty years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from Homeland Security Investigations and the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies.

2. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

3. I submit this affidavit in support of a Complaint for Forfeiture *in Rem* against the following asset:

> $29,380 in United States currency seized from Alexander Lee Cohen on
> March 17, 2016, at Boston Logan International Airport (the "Currency").

4. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

5. This affidavit is based upon my personal knowledge, training, and experience, as well as information provided to me by law enforcement personnel from the LATF involved in the investigation, and my review of records and reports relating to the investigation.

6. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate such a violation.

**The Seizure of the Currency**

7. On March 17, 2016, Transportation Security Administration ("TSA") agents assigned to Terminal B (United Airlines Checkpoint) at Logan Airport located in Boston, Massachusetts, requested assistance from LATF agents. TSA agents advised that a passenger, later identified as Alexander L. Cohen ("Cohen"), attempted to pass through the TSA checkpoint with what appeared to be a large "mass" in his carry-on, hard shell case. Upon further inspection of the case, TSA agents observed what appeared to be a large amount of currency.

8. Cohen was scheduled to depart from Boston on United Airlines Flight # 567 to Medford, Oregon, with a connecting flight in San Francisco, returning back to Boston on March 22, 2016. Cohen purchased his ticket on March 14, 2016, several days before his departure from Boston. Based on my training and experience, San Francisco and Medford are known source areas for the sale and cultivation of marijuana.

2

9.     When Cohen purchased his ticket, he included his address in Winthrop, Massachusetts 02152 and his phone number.

10.    LATF agents, including MSP Trooper Steven McDonald ("Trooper McDonald"), MPS Trooper David Fladger ("Trooper Fladger"), and I (collectively, the "investigators"), responded to TSA's request in order to investigate further. When we arrived, we were directed to Cohen.

11.    We identified ourselves to Cohen and explained that he was not under arrest, that he was not obligated to speak to us, and that he was free to leave at any time. Cohen was then asked questions regarding his travel plans and the large amount of currency found in his carry on case. Cohen responded that he was traveling to San Francisco, California, to purchase a car. As we were speaking with Cohen, we immediately noticed a strong, fresh odor of marijuana emanating from Cohen. Trooper McDonald inquired about the narcotics odor, and while avoiding eye contact with us, Cohen responded, "The smell is coming from me. I have a medical marijuana card." At no point in time did Cohen show us his medical marijuana card.

12.    Trooper McDonald then noticed that Cohen's face became flush and had a red tint. Cohen also began perspiring. We also noticed as we were speaking with him that Cohen's tongue had a white film that also appeared on the corners of his mouth, and that that prior to answering our questions, Cohen would repeat the question in its entirety prior to providing an answer. Based on my training and experience, these types of behaviors are consistent with indicators of nervousness and potential deceptiveness. As we continued to ask Cohen more questions, Cohen responded, "This is stupid. I don't see why I have to answer these questions." When Cohen stated this, Trooper McDonald reminded Cohen that he was not obligated to answer the questions and was free to leave at any time.

13. When we inquired further about the purchase of vehicle, Cohen then changed his story and said that he was traveling to Medford, Oregon – not San Francisco – to purchase a vehicle. When Trooper Walsh asked Cohen about his lodging plans, Cohen did not respond. Trooper Walsh then specifically asked Cohen if he had a reservation for a particular hotel. Cohen responded that he had not booked a hotel room yet. At this point, Cohen began sweating even more. Trooper Walsh then asked Cohen what type of vehicle he was planning to purchase, and Cohen responded that he planned to purchase a Porsche. However, Cohen was unable to provide any information regarding the car dealerships he was planning to visit. Trooper Walsh also asked Cohen if he had contacted car dealerships in advance of his trip, and Cohen reported that he contacted car dealerships on his cell phone. In response, Trooper Walsh asked Cohen to show his cell phone call history to him, which Cohen responded, "My cellphone is dead." Trooper Walsh then asked Cohen if his phone was dead or just off. Cohen answered, "I don't want to talk about my phone."

14. Trooper Walsh then inquired about Cohen's employment, and Cohen responded that he was unemployed and earned income as a property owner. He stated that he owned a property located in Winthrop, Massachusetts, which he described as a three family house. He also stated that he rents two of the units. When asked the amount of rent he charges, Cohen shrugged his shoulders and said, "Twenty five hundred bucks." Trooper Walsh asked Cohen the names of the individuals to whom he rents. Cohen did not respond.

15. Trooper Walsh also asked why the currency in his case smelled like fresh marijuana. Cohen responded, "I smoke weed and I have a card." Trooper Walsh asked Cohen where he purchases his marijuana and how he pays for it, and Cohen looked at the ground and did not respond. Cohen later commented that he banks at Salem 5 and Bank of America, but he

was unable to provide information as to which branches he generally uses. When Trooper Walsh inquired about Cohen's most recent banking experience, Cohen laughed and said, "I don't see why that matters." Cohen then indicated that he had answered enough questions. In response, Trooper Walsh told Cohen that he was free to leave and take his flight.

16. Based on Cohen's inconsistent statements and his behavior, Cohen was asked to accompany us to the Massachusetts State Police Troop F Barracks (the "Barracks") to speak with us further about his travel plans and the Currency. Cohen declined. Cohen also declined a receipt for the seizure of the Currency.

17. Subsequently, the Currency was transported to the Barracks. Trooper Fraser arranged for MSP Trooper Brian Bonia ("Trooper Bonia") and his K-9 Maximus ("Maximus") to examine the Currency and to perform a narcotics scan. Trooper Bonia has been employed by the MSP for 12 years and has been assigned to the canine unit since March of 2008. Maximus is a 9-year old German Shepherd. Trooper Bonia uses Maximus in the detection of controlled substances in different situations, including interdiction investigations. In October of 2008, Trooper Bonia and Maximus attended and successfully completed a 320-hour course in narcotics detection through the New England State Police Administrator's Conference ("NESPAC"). As a result, Maximus is certified to detect marijuana, cocaine, heroin, and methamphetamine. Trooper Bonia and Maximus attend recertification on a yearly basis. Their most recent certification was completed on November 11, 2015. Since the initial NESPAC accreditation course, Trooper Bonia and Maximus have maintained their training at a minimum of 16 hours per month. Searches conducted by Maximus have led to the seizure of marijuana, cocaine, heroin, and methamphetamine.

18. Trooper Fraser placed the Currency in an envelope in a randomly selected location within the interior of an office at the Barracks. Three other identical envelopes were also placed in randomly selected locations within the office. Within seconds of releasing Maximus, Trooper Bonia advised that Maximus had a positive alert to the location where the Currency was hidden and to the Currency, indicating the presence of narcotics odor. Trooper McDonald and Trooper Fraser then processed and secured the Currency. The Currency was then counted. The Currency was made up of the following denominations: 71 $100s, 8 $50s, and 1094 $20s. While counting the Currency, the investigators noticed a strong odor of marijuana.

### The Seizure of Additional Currency

19. Approximately two months after the seizure of the Currency described above, Cohen was involved in two traffic stops leading to the seizure of marijuana and then currency, respectively another seizure of currency.

20. On Wednesday, May 25, 2016, at approximately 9:00 a.m., Task Force Officer ("TFO") Bargstadt ("TFO Bargstadt") saw a silver BMW X5, bearing Massachusetts license plate 1LL425, tailgating several vehicles while traveling westbound on I-80 in Nebraska. TFO Bargstadt conducted a traffic stop of the vehicle. When TFO Bargstadt requested Cohen's identification, he provided TFO Bargstadt with a copy of a New Jersey state police family association card and stated that his brother was a lieutenant with New Jersey state police. Cohen then provided TFO Bargstadt with a copy of his Massachusetts license. While conducting a criminal history check, TFO Bargstadt discovered that Cohen had a criminal record. When asked about his criminal record, Cohen attempted to downplay it.

21. TFO Bargstadt inquired about Cohen's travel plans, and Cohen responded that he was driving to Oregon to meet friends for the Memorial Day holiday. Cohen also mentioned that he did not want to fly to Oregon because he does not fly. Cohen also tried to convince TFO Bargstadt that he was a real estate mortgage lender and made over $100,000 last year.

22. During the traffic stop, a narcotics dog scan was conducted by Voss, a Nebraska state certified K-9. He is certified to detect and indicate to the drug odors of cocaine, marijuana, heroin, and methamphetamines. Voss conducted an exterior scan of the vehicle and altered to the presence of narcotics odor. Cohen was advised that the K-9 alerted to the presence of narcotics odor, and Cohen was asked whether he had any large amounts of currency in his vehicle. Although Cohen was hesitant to respond, he stated that he had more than $10,000 in his vehicle. Even though he was asked several times how much he had, Cohen never provided an exact amount of currency. Thereafter, a consensual interior search of the vehicle was conducted, and law enforcement found a brown leather bag, which contained a heat sealed package of suspected marijuana. The package weighed approximately 58 grams. The inner pouch of the same bag also contained four rubber banded rolls of currency. When asked about the currency, Cohen responded that he had approximately $20,000 in United States currency, but Cohen declined to disclose the origin of the currency. Law enforcement gave the currency back to Cohen.

23. Later the same day, at approximately 5:46 p.m., Wyoming State Police Officer Jeramy Pittsley ("Officer Pittsley") conducted a traffic stop of a vehicle, bearing Massachusetts license plate 1LL425, traveling westbound on I-80 at speed of 100 miles per hour. Officer Pittsley inquired about the driver's rate of speed, and the driver responded that he was unaware of the speed limit and that he was trying to get to a gas station. Officer Pittsley asked the driver

for his identification, insurance, and registration. The driver was identified as Cohen. While Officer Pittsley was asking Cohen questions regarding his travel plans, Officer Pittsley noticed a strong odor of marijuana emanating from the vehicle. Officer Pittsley inquired about the marijuana odor and asked Cohen if he had any marijuana in the vehicle. Cohen responded that he had marijuana but that it was for medical use. Cohen also stated that he had approximately one gram of marijuana in his vehicle. When asked where the marijuana was located inside the vehicle, Cohen pointed to the center console. After Cohen showed Officer Pittsley where the marijuana was, Officer Pittsley asked whether Cohen was aware that marijuana was illegal in Wyoming, and Cohen stated that he was unaware of it.

24. Officer Pittsley further inquired about Cohen's travel plans, and Cohen stated that he was traveling to Oregon to his house to see friends for the Memorial Day holiday. When asked about his current employment, Cohen stated that he sold real estate for 3221 Fish Hatchery Road LLC that was located in Grants Pass, Oregon, and that he was self-employed. When asked further about his employment, Cohen then changed his story and stated that he was a mortgage broker for Citizens Bank and that he also sells properties. He also stated that he travels to his vacation/rental property in Oregon at least once a month to collect the rent. He also mentioned that he was planning to do some work on the property during his visit and that the money he had in his possession was going to be used to complete the work.

25. Officer Pittsley then asked Cohen for his consent to search the interior of his vehicle. Prior to conducting a search of the vehicle, Cohen told Officer Pittsley that there was approximately $15,000 currency in the vehicle, which he had received from the sale of "a house." However, Cohen was unable to provide any documentation to Officer Pittsley substantiating the origin of the currency or the sale of the property.

26. Officer Pittsley informed Cohen that he was going to have a K-9 to conduct a narcotics scan of the vehicle. Prior to conducting the scan, Officer Pittsley performed a pat down search of Cohen. During the search, Officer Pittsley discovered a business card for a Nebraska deputy officer, in addition to approximately $2,000 in United States currency. Officer Pittsley inquired about the business card, and Cohen told Officer Pittsley that he had been pulled over in Nebraska for a traffic violation, that the officer took the marijuana that he had in the vehicle at that time, that the officer knew that he had currency in the vehicle, that the officer told him that it was fine to have the currency, and that the officer subsequently let him go with his money. Officer Pittsley then asked Cohen how he obtained additional marijuana, and Cohen responded that he drove to Jewelsburg, Colorado and obtained additional "medical" marijuana. Officer Pittsley then inquired further about Cohen's travel route to Oregon, as Cohen could have taken a different – more direct – route to Oregon. Cohen responded that he thought the route he was taking was the quickest route.

27. Officer Pittsley's K-9, Wendy, conducted a scan of the vehicle. Wendy responded positively to narcotics odor on the driver's side of the vehicle. After the scan was completed, Officer Pittsley found two containers of suspected marijuana and a duffle bag with approximately $20,000 in United States currency. Officer Pittsley informed Cohen that the Attorney General would make a final determination regarding the seizure of the currency, and in response, Cohen explained that he contemplated depositing the currency in a bank account but noted that none of his banks were in the area. Cohen also later informed Officer Pittsley that he obtained the currency from the sale of his house in Massachusetts, and later said that some of it was from renal income. Cohen gave Officer Pittsley the address of the house that he said he sold in Massachusetts, and it was the same address Cohen used when he booked his flight from

Boston in March. Officer Pittsley also inquired further about Cohen's rental property in Oregon. Based on property searches that were conducted, the address Cohen provided was to an empty lot. The currency was later counted and totaled $20,570 with the following denominations: 171 20s, 5 50s, 169 100s.

28. After receiving this information, I conducted further research regarding the status of Cohen's house in Massachusetts. As of the date of this affidavit, there are no documents filed with the registry of deeds indicating a sale of the property in Winthrop identified by Cohen. Additionally, research was conducted to confirm Cohen's employment with Citizens Bank. Based on information received, Cohen is not employed with the bank.

## CONCLUSION

29. Based on the information provided above, I have probable cause to believe that the Currency constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846. Accordingly, the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

Signed under the pains and penalties of perjury, this 12th day of August 2016.

_____
David X. O'Neill, Special Agent
United States Drug Enforcement Administration